Michael L. **FRITCHIE** and **R & R Plastering, Inc.,** Plaintiffs,

v.

**ALUMAX INC.,** Defendant.

Stephen A. **ROTHWELL,** Plaintiff,

v.

**ALUMAX, INC.,** Defendant.

Nos. 4:CV94–3220, 4:CV94–3219.

United States District Court, D. Nebraska.

July 12, 1996.

**664**

Brenda Spilker, Baylor, Evnen, Curtiss, Grimit & Witt, Lincoln, NE, Joseph C. Dowding, Dowding, Dowding & Dowding, Lincoln, NE, for plaintiffs.

William R. Johnson, Raymond E. Walden, Kennedy, Holland, DeLacy & Svoboda, Omaha, NE, for defendant.

## MEMORANDUM AND ORDER

KOPF, District Judge.

These diversity cases (which have been consolidated for trial) present a number of questions of apparent first impression under Nebraska law [1] regarding the statute of limitations [2] in a product liability action involving

---

1. As a general matter "authority is sparse" in this area no matter what law is applied. *Richardson v. Gallo Equipment Co.*, 990 F.2d 330, 331 (7th Cir.1993) (Indiana law). On many of the questions there is no Nebraska law. Accordingly, I must make a so-called *"Erie"* guess about what the Nebraska Supreme Court would do if that court were confronted with similar questions. *Faries v. Atlas Truck Body Mfr. Co.*, 797 F.2d 619, 621 (8th Cir.1986); *Garoogian v. Medlock*, 592 F.2d 997, 1000 (8th Cir.1979).

2. Some commentators distinguish between a "statute of limitations" which bars an action after accrual of the right due to the passage of time and a "statute of repose" which bars an action before accrual of the right because of the passage of time. Note, *The Decline and Rise of Statutes of Repose*, 19 Creighton L.Rev. 509, 509 & n. 2 (1986). For purposes of this opinion I need not pursue the distinction (if there really is one). I use the phrase "statute of limitations" to include both concepts.

the sale, leasing and resale of a scaffold[3] and the implications which flow from the production of replacement parts for the scaffold.

A bench trial on the statute of limitations questions has now concluded. Deciding that the statute of limitations bars recovery, pursuant to Rule 52 of the Federal Rules of Civil Procedure I now set forth the findings of fact and conclusions of law that have informed my decision.[4]

## I.

I find the material facts to be these:

### Background

1. During the pertinent time frame Michael L. Fritchie (Fritchie) and Stephen A. Rothwell (Rothwell), Nebraska residents, worked for or held a part ownership interest in R & R Plastering, Inc., (R & R), a Nebraska Corporation, which had its principal place of business in Nebraska. (Filing 138 ¶¶ D4, D5.)[5]

2. Louisville Ladder Corporation (Louisville Ladder) is a Missouri Corporation with its principal place of business in Kentucky. Alumax Inc., (Alumax) is a Georgia Corporation with its principal place of business in Georgia. (*Id.* ¶ D6.)

3. According to the complaint, Fritchie and Rothwell sued Louisville Ladder on June 6, 1994 regarding an accident that took place in Nebraska on November 12, 1991 when the scaffold Fritchie and Rothwell were standing on gave way causing the men to fall to the ground. (Filing 1.) R & R was made a party solely because of its payment of workers' compensation benefits to or for the benefit of Fritchie. (Filing 19.)

4. Alumax was named a defendant on January 6, 1995 (filing 19), and it appeared on January 9, 1995. (Filing 21.) On February 6, 1996 the suit against Louisville Ladder

was dismissed without prejudice. (Filing 142.)

### Jurisdiction and applicable law

5. It is undisputed that this court has diversity jurisdiction over the subject matter of the suit and personal jurisdiction over the parties.

6. The parties agree that Nebraska law applies.

### The claim

7. In their amended complaint Fritchie and Rothwell claimed the accident was caused by a defective design in the scaffold and connector hook manufactured by Alumax. (Filing 19 ¶ 11.) Specifically, Fritchie and Rothwell claim that the design was defective because "of inadequate reinforcement supporting the connector hooks to the scaffold deck". (*Id.* ¶ 9.)

8. The hooks are designed for location on the four corners of the scaffold deck and are intended to support the scaffold deck to the frame which raises the scaffold above the ground. The hooks were designed to be fastened by two bolts, two nuts, and a plate (the hook and associated parts are denominated as the "hook assembly") to the side of the scaffold deck.

### Mode of failure

9. There is no dispute about the mode of failure. The mode of failure was the separation of the hook assembly (shown in Ex. 238, pictures A, B & C) (copy attached) from the side wall of the scaffold (shown in Ex. 238, pictures D & E) (copy attached) thereby permitting one edge of the scaffold to dip which in turn caused the two men to fall from the scaffold. (*Compare* testimony of defense expert (Vol. II, Tr. 101:17–18) *with* testimony of Plaintiffs' expert (Vol. III, Tr. 270:11–12).)

10. Exhibit 238, picture A (copy attached), shows a side view of the scaffold that

---

3. The product at issue here is sometimes called a scaffold deck which refers to a plywood plank, metal rails which form the sides, and various components, such as hooks which hold the deck to the structure used to raise the deck above the ground. For the sake of simplicity I refer to the product as a "scaffold" unless otherwise indicated in the text.

4. Any finding of fact that is more properly a conclusion of law shall be so construed. Alternatively, any conclusion of law that is more properly construed as a finding of fact shall be so construed.

5. All filing references are to 4:CV94–3219 unless otherwise indicated.

fractured with the hook assembly held in rough proximity to where the assembly and a small portion of the sidewall attached to the assembly separated as a unit from the remainder of the side of the scaffold. Exhibit 241, picture B (copy attached), shows the mounting of the hook assembly in relation to the side of an exemplar scaffold. Exhibit 41 is the actual hook assembly and the portion of the side wall which was secured between the hook and the plate all of which separated as a unit from the remainder of the side wall of the scaffold. Exhibit 238, pictures A, B & C (copy attached), depicts Exhibit 41 in the condition it was after the failure.

### Factual reason for failure

11. Both experts agreed that as a matter of fact the reason the hook assembly separated from the side wall of the scaffold was because of the cracking and ultimate failure of the side wall of the scaffold which cracking was caused by the bending of the side wall. (*Compare* testimony of defense expert (Vol. II, Tr. 104:11–105:7) *with* testimony of Plaintiffs' expert (Vol. III, Tr. 295:20–296:12).) Specifically, the experts agreed that:

(a) as lateral pressure was applied during the use of the scaffold the side wall of the scaffold was forced to bend inward and outward;

(b) given a number of such bending actions, over time a fatigue crack developed in the side wall of the scaffold at some point near to where the hook was fastened by the plate, nuts and bolt to the side wall;

(c) over time the fatigue crack grew in the side wall such that the fatigue crack followed the perimeter of the plate holding the hook to the side wall; and,

(d) ultimately, when the crack increased along the perimeter of the plate to the degree that the weakened side wall was no longer able to carry the load, the hook assembly, as a unit, together with the portion of the side wall which was secured between the hook and the plate, separated from the remainder of the side wall.

12. Exhibit 238, pictures D & E (copy attached), shows the remainder of the fractured side wall and the edge of the crack on the remainder of the sidewall that followed

the perimeter of the plate. Exhibit 238, picture B (copy attached), shows the hook assembly and the portion of the side wall which was secured between the hook and plate, after the hook assembly and the portion of the side wall which was secured between the hook and plate, had separated from the remainder of the side wall.

### Legal reason for the failure

13. Plaintiffs' expert stated, and I take as true for purposes of this opinion, that the legal reason (the "proximate cause" under Nebraska law) for the accident was the "design deficiency of the hook connection to the side rail of the scaffolding." (Vol. III, Tr. 299:7–15.)

14. According to Plaintiffs' expert, the design was defective because:

[T]he area at which the hook is attached to the sidewall, the amount of area is too small for the use to which this hook will be subjected to, and to state that another way, the stress that the hook imparts to the side rail is excessively high. Whenever the hook sees a lateral force so it causes the side rail to bend in a very small area and initiates a fatigue crack as we've described previously.

(Vol. III, Tr. 296:5–12.)

### How the hook assembly was designed to attach to the scaffold wall

15. There is no dispute about how the hook assembly was designed to be attached to the scaffold wall. (*Compare* defense expert testimony (Vol. II, Tr. 117:1–118:8) *with* testimony of Plaintiffs' expert (Vol. III, Tr. 270:16–271:5).) The hook assembly is attached to the scaffold by first placing the hook against one side of the side wall of the scaffold. Then two bolts are passed through the hook and side wall. Once the two bolts are passed through the hook and the side wall the bolts are also passed through a plate situated on the other side of the wall. Two nuts are then placed on the bolts. The plate thus serves as a type of washer with the side wall situated between the hook and the plate. Thus, when the nuts are tightened they draw the plate, the wall, and the hook together

against the bolts to fasten the hook assembly to the wall.

16. Exhibit 241, picture B (copy attached), shows a hook assembly like the one at issue attached to an exemplare [6] of a similar scaffold in new condition. (Vol. I, Tr. 72:17–73:1.) A fabrication drawing also shows a cross sectional view of the hook assembly attached to the side wall. (Ex. 141 (drawing c).) (copy attached).

### The plate

17. The plate (Ex. 244, fabrication drawing) (copy attached) is a part of the hook assembly and is essentially a rectangular piece of metal with two holes drilled through the plate to accommodate the bolts.

18. The linear dimensions of the plate are approximately 1.125 inches ("short side") by approximately 2.062 inches ("long side"). In terms of the configuration of the plate as a part of the hook assembly the "short sides" of the plate are properly visualized as the "top" and "bottom" lines of the rectangle and the "long sides" of the plate are properly visualized as the "right" and "left" lines of the rectangle. The bolt holes are not centered, but are situated closer to one "long side" (about .406 inches) than the other (about .719 inches), but equidistant from both "short sides" (about .345 inches). The plate has a metal ridge which extends from one "long side" to the other. Like the bolt holes the ridge is not centered. The ridge is located about $1\frac{3}{16}$th of an inch from one "short side" (properly visualized as the "top") of the rectangle and about 1 and $\frac{9}{16}$ inches from the other "short side" (properly visualized as the "bottom") of the rectangle.

19. As shown by an exemplar and fabrication drawings, at the factory when the plate is installed with the other components of the hook assembly on the side wall of the scaffold, the ridge on the plate is closer to the "top" than the "bottom" of the rectangle.

(Ex. 241, picture B; Ex. 244; Ex. 141, drawing c) (copies attached.)

### Reversal of plate would not cause failure

20. All agree that the plate can be "reversed" (installed "upside down") in terms of the relationship of the ridge to the "top" or "bottom" of the plate. (*Compare* testimony of defense expert (Vol. II, Tr. 153:10–14) *with* testimony of Plaintiffs' expert (Vol. III, Tr. 302:5–303:23).) It is helpful to be able to visualize this reversal. Accordingly, I have modified exhibit 244, and have attached it hereto as Exhibit 244A for purposes of illustration. In the illustration a copy of the fabrication drawing of the plate in the proper aspect (right side up) has been made and appears as figure A. Figure B of the illustration shows the plate in a reversed position (upside down). Figure C shows figure B superimposed upon figure A. Note that in figure C the bolt holes in figures A and B are aligned. By aligning the bolt holes on figures A and B one can see in figure C that even though the bolt holes are not centered on the plate reversal of the plate can be accomplished while at the same time accommodating the bolts which are obviously unchanged by the reversal. One can also see that reversal of the plate exposes a portion of the side wall (which is shaded on figure 3) that would not be exposed if the plate were in the proper aspect because when the plate is reversed it must be moved laterally to accommodate the bolts.

21. The experts agree that if the plate is installed in the normal "right side up" manner the failure due to cracking of the side wall takes slightly longer (requires a longer crack) than if the plate were installed in the reverse "up side down" manner. (*Id.*) [7] Plaintiffs' expert stated, and I assume that his statement is true for purposes of this opinion, that inversion of the plate from the normal position would accelerate the "time to failure" by a "ballpark estimate" of 20 percent. (Vol. III, Tr. 303:3–23.)

---

6. The exemplar is slightly different than the scaffold at issue. The exemplar has a "taller cross brace" but "basically the same hook arrangement." (Vol. I, Tr. 72:8–10.) Thus the exemplar is an accurate depiction of the hook assembly as it would have looked after it was attached to the scaffold at the manufacturing plant.

7. The defense expert stated that if the washer plate was not inverted a longer crack along the top edge was required for failure as compared to inversion of the plate. Plaintiffs' expert expressed this same phenomenon in terms of time to failure rather than in terms of length of crack.

22. Both experts also agreed that failure would occur whether or not the plate was "reversed." (*Compare* testimony of defense expert (Vol. II, Tr. 152:2–153:5) *with* testimony of Plaintiffs' expert (Vol. III, Tr. 302:5–13).) Specifically, Plaintiffs' expert stated in answer to a question by the court that he agreed with the defense expert that "the fracture would have occurred whether or not the washer plate had been inverted." (Vol. III, Tr. 302:8–12.)

### Date of manufacture of scaffold— no later than April 30, 1977

23. Louisville Ladder sold scaffolds that were manufactured by Alumax (successor in interest to Howmet). (Testimony of John M. Monohan.)

24. By examining the scaffold, including an examination of the residue of a unique label on the subject scaffold which contained punch marks indicating a month and year, John M. Monohan, former vice-president of administration and engineering at Louisville Ladder, testified that the scaffold in question was manufactured by Alumax for Louisville Ladder in April of 1977. (Vol. I, Tr. 48:11–49:2.)

25. By examining the scaffold, including such things as the type of load rating stencil, Jimmie G. Davis, general manager of Alumax's plant, testified that the subject scaffold was manufactured by Alumax "prior to the end of April or first of May, 1977." (Vol. I, Tr. 83:3–84:4.)

26. I find that the scaffold at issue was manufactured by Alumax for Louisville Ladder sometime in April of 1977, and no later than April 30, 1977. (Ex. 105, label and manufacturing chronology comparison.)

### Date of sale of scaffold to SESCO— no later than July 1, 1977

27. Because the scaffold in question was a ten foot scaffold which was not kept in inventory by Louisville Ladder, and because Louisville Ladder would not have ordered the manufacture of the scaffold by Alumax unless it had an order in hand, Mr. Monohan was also able to confirm, by reference to the company's normal business practice, that Louisville Ladder sold and delivered the subject scaffold to a customer no later than three to six weeks after the last day of April 1977. (Vol. I, Tr. 49:3–23.)

28. The parties have stipulated that subject scaffold was sold by Louisville Ladder to SESCO. (Filing 138 ¶ D18.)

29. Given the date of manufacture of the scaffold in April of 1977, the normal practice of Louisville Ladder to sell and deliver ten foot scaffolds within three to six weeks after the scaffolds were manufactured, and the stipulation that the subject ladder was sold by Louisville Ladder to SESCO, I find that SESCO would have come into possession of the subject scaffold no later than July 1, 1977.

### SESCO put scaffold to "use" no later than January 1, 1978

30. SESCO is a company which leases construction equipment and it has offices in Iowa and Nebraska. (Vol. II, Tr. 165:23–166:25.) SESCO would have done one of two things with the scaffold when it received it from Louisville Ladder according to SESCO's president who testified at trial. (Vol. II, Tr. testimony of Forest W. Schoeneman, Jr.)

31. Since SESCO's primary business was to lease equipment it is most likely that SESCO would have immediately placed the scaffold in its inventory for lease and thereafter leased the scaffold to third-parties. Leasing would have occurred very shortly after the scaffold was received, and certainly within six months of the date SESCO received the scaffold. (Vol. II, Tr. 170:5–19; 173:8–23.)

32. SESCO might have sold the scaffold to a customer as new equipment rather than leasing the scaffold. However, in this circumstance, the scaffold would have been sold soon after receipt because such scaffolds were immediately placed in inventory for lease. Once used the scaffold could not be sold as new, and there were "never any stacks of new scaffold deck sitting around not being used." (Vol. II, Tr. 170:5–20; 171:18–172:6; 173:13–23.)

33. The scaffold would not have been in SESCO's inventory unleased for more than

six months from date of receipt. (Vol. II, Tr. 170:5–19; 173:17–19.)

34. I find that SESCO either sold the scaffold at issue or leased the scaffold soon after receiving the scaffold. Since I know that the scaffold at issue was sold to R & R more than 11 years after SESCO received the scaffold, I find the scaffold was placed into "use" by SESCO, through leasing to third-parties, no later than January 1, 1978 (six months after SESCO received the scaffold) because it is impossible to believe, given SESCO's normal business practices, that SESCO would have bought a scaffold and would not have leased it for more than 10 years.

### The "used" scaffold was sold to R & R on April 24, 1989

35. It is stipulated by the parties that the subject scaffold (as well as nine other scaffolds, and miscellaneous equipment) was sold by SESCO to R & R on April 24, 1989. (Filing 138 ¶ D19; Ex. 1.) The scaffold was delivered to R & R in Lincoln, Nebraska by a SESCO employee of the Norfolk office of SESCO on or about May 3, 1989. (Ex. 218 at Tr. 23:16–24:1 & Depo. Ex. 2.)

36. The manager of the SESCO office in Norfolk, Nebraska who made the sale to R & R testified that the scaffolds he sold to R & R were used and that he was sure of this testimony because of coded notations on the invoice[8], because of the low price of the scaffolds, and because the Norfolk office never had new scaffolds. (Ex. 218, Tr. 12:12–17; 19:4–8; 22:3–23:7; 28:15–22; 40:12–24; Depo. Exs. 1 & 2.) The president of SESCO also believed that "New deck was not ever put over in Norfolk to be sold as new deck." (Vol. II, Tr. 179:6–9.) The manager of the Lincoln, Nebraska office of SESCO also testified regarding the standard form invoices that represent the documents of sale in this transaction. He agreed with the Norfolk, Nebraska manager of SESCO that the sale documents involving the scaffold at issue represented the sale of a used scaffold because of coded notations on the documents and

because of the low price of the scaffold. (Vol. II, Tr. 186:3–187:6.)

37. Rothwell testified that R & R ordered new scaffold from SESCO. (Vol. II, Tr. 224:1–11; 228:5–11.) Rothwell inspected the scaffold at issue (and the nine others) the night the equipment was delivered to the job site by SESCO. (Vol. II, Tr. 229:15–20.) Rothwell was not present when the scaffold was delivered. (Vol. II, Tr. 230:2–6.) The scaffold appeared new to Rothwell because the plywood deck was not weathered, there was no plaster on the scaffold, the sides looked shiny and bright, and there were no gouges or other marks on the plywood deck. (Vol. II, Tr. 231:8–11).

38. The president of SESCO testified that after each time SESCO leased a scaffold SESCO employees inspected and cleaned the scaffold when it was returned by the customer. (Vol. II, Tr. 170:20–171:17.) This cleaning practice was also confirmed by a manager of one of SESCO's stores. (Vol. II, Tr. 185:12–20.)

39. Although Rothwell believed the scaffold was new, I find that the scaffold in fact had been used by SESCO for leasing purposes, and I find that Rothwell's belief that the scaffold was new was erroneous. I believe that Rothwell was incorrect in this regard because SESCO cleaned scaffolds after every lease, and thus the scaffold likely appeared new to Rothwell even though it was not in fact new. Moreover, the employees of SESCO, unlike Rothwell, have no apparent interest in this litigation and for that reason are the more credible witnesses as to whether the scaffold was new or used. Finally, the relatively low price of the scaffold and the fact that the contract documents are coded to represent the sale of rental equipment further convince me that the scaffold had been leased by SESCO prior to its sale to R & R.

### At an unknown date after manufacture the plate was reversed

40. As Mr. Davis from Alumax testified, the "washer plate on the separated hook had been changed and inverted 180 degrees from

---

**8.** The president of SESCO testified that "we have a computer code for rental items, and we put them automatically into our rental fleet, and they become identified quantitywise and are put on depreciation." (Vol. II, Tr. 178:6–8.)

its originally installed position." (Vol. II, Tr. 195:24–196:2.)

41. Both experts agreed with Davis's assessment because an examination of the portion of the wall which did not separate reveals an exposed burnish mark where the plate was originally installed. The burnish mark would not have been evident if the plate had not been reversed, and this mark thus establishes that the plate was reversed sometime after manufacture. (*Compare* testimony of defense expert (Vol. II, Tr. 140:8–141:7) *with* testimony of Plaintiffs' expert (Vol. III, Tr. 271:5–272:14).) The shaded portion of Exhibit 244A, figure C illustrates the burnish mark.

42. There is no competent evidence that establishes when the plate was reversed after it was manufactured. For example, at the time of the deposition of Plaintiffs' expert (which took place after the Rule 26 expert disclosure) (Vol. III, Tr. 294:22–295:3) the expert "had no opinion concerning when the washer plate was reinstalled...." (Vol. III, Tr. 292:3–5.)

**There is no way to establish that the hook assembly was a replacement and, even if it was a replacement, there is no way to establish when, after manufacture, it was replaced**

43. Alumax manufactured and sold "repair parts" for the scaffold which included replacement two bolt hook assemblies. (Vol. II, Tr. 206:3–5, 13–18; Exs. 87, 88.) On or before August 15, 1985 (Vol. II, Tr. 207:14–16) Alumax manufactured hundreds of thousands of these two bolt hook assemblies like the one at issue, and all were manufactured without serial numbers. (Vol. II, Tr. 205:3–4). Alumax delivered some of the replacement hook assemblies to customers such as Louisville Ladder. (Exs. 87, 88.) These customers would in turn distribute the replacement hook assemblies to their various customers who had ordered replacement hook assemblies. (Vol. II, Tr. 207:21–24.)

44. There is no way to establish that the hook assembly which separated from the side wall is a replacement hook assembly because the original hook assembly has the same design specifications as a replacement hook assembly. (Vol. II, Tr. 118:17–20; 119:3–7;

141:13–18; 204:23–205:5; Vol. III, Tr. 300:16–23.)

45. As Mr. Davis testified, given the reversal of the plate the "hook could have been replaced, or it could have been simply removed and put back." (Vol. II, Tr. 203:25–204:1.)

46. Since there is no competent evidence to establish when reversal of the plate took place and since there is no way to distinguish between original and replacement hook assemblies, even if the hook assembly was a replacement there is no way to know when, after manufacture, a replacement was installed.

47. Moreover, even if the hook assembly was a replacement, given the burnish mark it is obvious that the original hook assembly was properly installed by Alumax, and thus any replacement would have been installed by someone other than Alumax at some unknown date after manufacture of the scaffold.

**A replacement hook assembly is a repair part**

48. Because hook assemblies can break or bend within a week or two after the scaffold is sold without damage to the remainder of the scaffold, Alumax manufactured replacement hook assemblies so that the scaffold could be repaired rather than discarded soon after it was sold. (Vol. II, Tr. 212:14–213:12.)

49. Mr. Davis of Alumax stated that the design of the scaffold was intended to accommodate replacement hook assemblies "in order that a consumer might have the option to extend the use of the life of the product" by "repairing a part." (Vol. II, Tr. 206:13–18.)

50. Mr. Davis further specified that Alumax designed the scaffold to accommodate replacement hook assemblies in the same way a car is designed to accommodate a new tire, and that is the sense that Davis meant that a replacement hook assembly could extend the life of a scaffold. (Vol. II, Tr. 213:12–21.)

51. It is undisputed that replacement of one hook assembly for another would make no difference to whether the injury in this case occurred; that is, the result of substitu-

tion of one hook assembly for another "would be indistinguishable." (Vol. II, Tr. 152:13–153:15.) This is true because the design of the original hook assembly and any replacement was identical. (Vol. II, Tr. 118:17–20; 119:3–7; 141:13–18; 204:23–205:5; Vol. III, Tr. 300:16–25; 301:1–7.)

## II.

Neb.Rev.Stat. § 25–224(2) (Reissue 1995) provides in pertinent part that "any products liability action, except one governed by section 2–725, Uniform Commercial Code ... shall be commenced within ten years after the date when the product which allegedly caused the personal injury ... was first sold or leased for use or consumption."

I find and conclude that Alumax has proven that Plaintiffs' claims are barred by Neb. Rev.Stat. § 25–224(2). My reasons for this decision are stated in the following portion of this opinion.

### A. Burden of proof

█ Under Nebraska law the burden of proving factual entitlement to the bar of Neb.Rev.Stat. § 25–224(2) falls upon the defendant in cases like this one where the statute is raised as an affirmative defense. *See e.g., Nebraska Public Employees Local No. 251 v. City of Omaha,* 244 Neb. 328, 333, 506 N.W.2d 686, 690 (1993) (quoting *Broekemeier Ford v. Clatanoff,* 240 Neb. 265, 272, 481 N.W.2d 416, 421 (1992)); *Nebraska Jury Instructions Second Edition* 2.02D cmt. at 97, 11.20 cmt. at 637–38 (1989) (*NJI2d*).

█ In Nebraska civil cases the burden of proof has been expressed in two different ways depending upon the nature of the case. In most cases the burden is expressed by the common "greater weight of the evidence" formulation. *NJI2d* 2.12A cmt. at 108–10. In a few circumstances (such as enforcement of lost promissory notes) the burden is expressed as the more stringent "clear and convincing evidence" formulation. *Id.* 2.12B cmt. at 112–13. I have found no Nebraska case which specifically states the proper formulation of the burden of proof in product

liability statute of limitations cases. However, it is generally agreed that the "usual burden of proof in a civil case is the burden of proving a fact by the greater weight of the evidence." *NJI2d* 2.12B authorities at 113.

Accordingly, I find and conclude that the proper burden of proof formulation is the one known as the "greater weight of the evidence" and not the "clear and convincing evidence" test.[9] Thus, Alumax must prove the factual predicate for its statute of limitation defense by offering "evidence sufficient to make [its] claim more likely true than not true." *NJI2d* 2.12A at 108.

### B. UCC § 2–725 does not apply

Plaintiffs assert that Nebraska Uniform Commercial Code § 2–725 applies. Neb. UCC § 2–725 is an exception to the applicability of Neb.Rev.Stat. § 25–224(2). Neb. UCC § 2–725 states in pertinent part that:

(1) *An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued.* By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

(2) *A cause of action accrues when the breach occurs,* regardless of the aggrieved party's lack of knowledge of the breach. *A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance* the cause of action accrues when the breach is or should have been discovered.

(emphasis added.)

Plaintiffs argue that they commenced this suit on June 6, 1994. They further argue (albeit generally) that there was a warranty by Alumax explicitly extending to future performance. Plaintiffs further assert that they sued within four years of the date (November 12, 1991) they discovered the defect in the product, and in this regard assert that they discovered the defect on the date the

9. Nevertheless, the result I reach in this case would be the same no matter what formulation I   used.

scaffold failed. In short Plaintiffs argue that Neb.Rev.Stat. § 25–224(2) does not apply to cases governed by Neb. UCC § 2–725, and further that their case is governed by the discovery exception contained in Neb. UCC § 2–725(2). I disagree with Plaintiffs that their case is governed by Neb. UCC § 2–725(2) for two reasons.

### 1.

■ First, this case does not fit generically with the words or structure of Neb. UCC § 2–725 as it is not primarily a contract action. In contrast, this suit primarily involves a claim by employees of a buyer of goods for personal injuries, the claim is primarily one that the product was defectively designed, and the claim is asserted against a manufacturer who had no direct contractual relationship with either the buyer or the seller of the goods.

■ Where the claims are predominantly tort-like in nature (as they are here), rather than principally contractual in nature, the Nebraska courts apply Neb.Rev.Stat. § 25–224 rather than Neb. UCC § 2–725. *Thomas v. Countryside of Hastings, Inc.*, 246 Neb. 907, 909–11, 524 N.W.2d 311, 312–14 (1994) (reversing trial court and court of appeals, and holding that where home owners claiming personal injuries sued seller-mobile home manufacturer regarding the installation of a furnace, products liability statute of limitations (Neb.Rev.Stat. § 25–224) rather than Uniform Commercial Code statute of limitations (Neb. UCC § 2–725) applied because the action was properly characterized as a tort rather than a contract action.)

Professors White and Summers have put the point made in *Thomas* more simply. They state "the courts will infrequently follow [section 2–725] when the plaintiff's blood has been spilled or when the defendant is a remote seller." 1 James White & Robert Summers, *Uniform Commercial Code*, § 11–9 at 611 (4th ed. 1995).

After examining "the nature of the injury, the language of the complaint, and whether the parties are in privity of contract" as suggested by White and Summers, *id.* at 606, this case appears to be more like a tort action than "[a]n action for breach of contract" covered by Neb. UCC § 2–725. Accordingly, pursuant to *Thomas* I find and conclude that Neb.Rev.Stat. § 25–224(2), rather than Neb. UCC § 2–725(2), applies to this case.

### 2.

Second, in order for Plaintiffs to take advantage of section 2–725(2) they must point to a warranty that *"explicitly* extends to future performance," and they cannot do so.[10] I find no warranty that "explicitly extends to future performance" alleged in the complaint, presented in the evidence [11], or set forth in the briefs.

■ In this regard, the UCC § 2–725(2) "extension of the normal warranty period does not occur in the usual case, even though all warranties in a sense apply to the future performance of goods." 1 James White & Robert Summers, *Uniform Commercial Code*, § 11–9 at 608. Under Nebraska law implied warranties do not trigger the UCC § 2–725(2) exception; that is, the warranty must be "a particularized representation to a buyer" in order for there to be an express warranty which will trigger UCC § 2–725(2). *Murphy v. Spelts–Schultz Lumber Co*, 240 Neb. 275, 286–87, 481 N.W.2d 422, 430–31 (1992) (no warranty triggering UCC § 2–725(2) regarding roof trusses because there was no "particularized representation to [the] buyer" beyond the description of "roofing trusses.")

Accordingly, since there is no "particularized representation" that "explicitly extends to future performance" contained in the complaint, presented in the evidence, or argued in the brief, Neb. UCC § 2–725(2) does not apply.

---

**10.** Otherwise the breach, and thus the accrual of the cause of action, occurred when "tender of delivery" under Neb. UCC § 2–725(2) took place, and no matter how one measures tender of delivery (by Alumax or SESCO), tender of delivery took place more than four years prior to the date the plaintiffs filed suit.

**11.** In their brief Plaintiffs mention without elaboration certain brochures without telling me upon what language in the brochures they rely upon to establish a warranty that "explicitly extends to future performance."

**3.**

In summary, Neb. UCC § 2–725 does not apply for two reasons. First, this case does not fit generically with the words or structure of Neb. UCC § 2–725 as it is not primarily a contract action. Second, in order for Plaintiffs to take advantage of section 2–725(2) they must point to a warranty that "explicitly extends to future performance," and they cannot do so.

### C. The "product" is the scaffold as a unit

■ Having determined that this case is not governed by Neb. UCC § 2–725, I must next determine what the "product" is. This determination is required because Neb.Rev. Stat. § 25–224(2) is measured by "the date when the *product* which allegedly caused the personal injury ... was first sold or leased for use or consumption." (emphasis added). I find and conclude that the "product" in this case is properly understood to be the scaffold as a unit which includes the hook assembly.

**1.**

I must first define terms.

■ The term "product" is not defined in section 25–224(2). However, the legislative history of this section "defines the word 'product' as used in that section to coincide with the meaning of 'goods' under the Uniform Commercial Code." Note, *The Decline and Rise of Statutes of Repose,* 19 Creighton L.Rev. at 529 (citing *Hearings on L.B. 665 Before the Committee on Banking Commerce and Insurance,* Neb. Unicameral, 85th Leg., 2d Sess. 6855–56 (Feb. 27, 1978)).

"Goods" are defined in the Uniform Commercial Code. *See* Neb. UCC § 2–105 (Reissue 1992). The "definition of goods is based on the concept of movability." *Id.* at cmt. 1. "Goods" specifically include "specially manufactured goods." UCC § 2–105(1).

Accordingly, borrowing from the language of the Uniform Commercial Code, as the Nebraska Legislature intended, and using the Uniform Commercial Code example of "goods" that best fits the facts of this case, it is appropriate to substitute the term "manufactured goods" for the word "product" in section 25–224(2). The question thus becomes what "manufactured goods ... caused the personal injury."

But that question brings into play another definitional problem. What is meant by the word "caused"? The term is not defined in the statute. Still further, so far as I can determine there is no readily ascertainable meaning which can be derived from the legislative history of the statute or the cases interpreting the statute. It is therefore appropriate to refer to Nebraska tort law generally in an effort to understand the meaning of the word "cause."

■ Under Nebraska tort law the concept of "cause" means "proximate cause." *NJI2d* 3.41 at 3.41–1 to –7 (collecting cases and discussing various dimensions of causation, concluding that all the dimensions of causation are included with the term "proximate cause"). And, in Nebraska, "proximate cause" means "that [which] produces a result in a natural and continuous sequence, and without which the result would not have occurred." *Id.*

**2.**

Having defined the terms "product" and "cause," the question—what was the product that caused the injury?—can be reformulated in more meaningful terms. The reformulated question is this: What manufactured goods produced the personal injury in a natural and continuous sequence, and without which the personal injury would not have occurred? I turn to that task next.

There is no dispute that the "mode of failure" (Pt I ¶¶ 9–10), and the "factual cause" of the injury (Pt I ¶¶ 11–12) involved *both* the hook assembly and the side rail of the scaffold. The same is true for "proximate cause." Indeed, Plaintiffs' expert stated that the "proximate cause" of the accident was the "design deficiency of the *hook connection to the side rail of the scaffolding.*" (Vol. III, Tr. 299:7–15) (emphasis added).

Plaintiffs admitted in their amended complaint that the cause of the injury was inextricably tied to the scaffold as a unit and not simply the hook connection. In that complaint they alleged that "the aforementioned

defective product" which proximately caused the injury was the "scaffold deck and connector hook." (Filing 19 ¶¶ 11–12.) This allegation makes perfect sense since the hook assembly could not have caused the injury without the failure of the metal in the side wall of the scaffold.

This point is vividly illustrated by examining Exhibit 41. The exhibit reveals that when the hook assembly separated from the side wall the hook assembly did not simply slip from the side wall, but rather the hook assembly carried with it the fractured portion of the side wall that was between the hook and the plate. This portion of the side wall can clearly be seen in Exhibit 238, picture B. (Vol. I, Tr. 105:23–106:8.) Had this portion of the side wall not separated there would have been no injury.

### 3.

In sum, the "product" that "caused" the injury was the scaffold, including the hook assembly, as a unit, and not the hook assembly.

### D. "[F]irst sold or leased for use"—January 1, 1978

I must next determine when the scaffold, including the hook assembly, as a unit (the "product") was "first sold or leased for use or consumption" because that is the beginning date for purposes of the statute of limitations. Neb.Rev.Stat. § 25–224(2). I find and conclude that the scaffold as a unit was "first sold for use" on or before January 1, 1978. This is the latest date that SESCO would have begun to lease the scaffold to its customers.

### 1.

The Nebraska Supreme Court has set forth principles for determining when a product is "first sold for use." *Witherspoon v. Sides Construction Co.*, 219 Neb. 117, 362 N.W.2d 35 (1985). In that case the manufacturer of pipe was sued. The pipe was manufactured, sold to a contractor and installed in a home which was under construction in September of 1969. At that time water began to flow through the pipe as the house was being constructed. Near Christmas 1970 the house was completed and sold to Witherspoon. On December 31, 1979 the pipe broke through the foundation and flooded the basement. Witherspoon filed suit on December 9, 1980 against the pipe manufacturer and others. The trial court granted summary judgment for the manufacturer (and others). The Nebraska Supreme Court reversed as to the manufacturer.

At least four principles can be distilled from *Witherspoon* which are applicable to this case. *See also* Note, *The Decline and Rise of Statutes of Repose*, 19 Creighton L.Rev. at 532, 538–39. I turn to those principles next.

First, normally "first sold for use" means "the date of sale for personal property." *Id.* at 532 (*citing Witherspoon*, 219 Neb. at 122–23, 362 N.W.2d at 41). Second, a product is not "first sold for use" until the "ultimate consumer [as opposed to a wholesaler or retailer] receives the product." *Id.* at 539 (citing *Witherspoon*, 219 Neb. at 121, 362 N.W.2d at 40). Third, a retailer may also be the ultimate consumer, such as where the retailer was " 'using [the product] as a part of their own operation, not as a wholesaler, or not as a retailer.' " *Witherspoon*, 219 Neb. at 121, 362 N.W.2d at 40 (quoting *Floor Debate on L.B. 665*, Neb. Unicameral 85th Leg., 2d Sess. 6861 (Feb. 27, 1978) (statement of Senator Bereuter)). *See* Note, *The Decline and Rise of Statutes of Repose*, 19 Creighton L.Rev. at 539 & n. 315. Fourth, if a product is resold by the first ultimate consumer to a second consumer such a sale does not restart the statute of limitations or otherwise extend the statute of limitations. *Witherspoon*, 219 Neb. at 121, 362 N.W.2d at 40 (quoting *Floor Debate on L.B. 665*, Neb. Unicameral 85th Leg., 2d Sess 6861 (Feb. 27, 1978) (statement of Sen. Bereuter). *See* Note, *The Decline and Rise of Statutes of Repose*, 19 Creighton L.Rev. at 539 & n. 322.

### 2.

I next apply the *Witherspoon* principles to this case.

Using the first principle derived from *Witherspoon*, I must try to determine the date of sale of the personal property. But this first principle does not resolve the

matter since as a matter of fact there are three dates of sale which might be applicable and those are the date of sale to Louisville Ladder, the date of sale to SESCO, or the date of sale to R & R.

Using the second principle derived from *Witherspoon*, I must endeavor to determine which is the first ultimate consumer as between these three parties. Clearly Louisville Ladder is not the first ultimate consumer since it was a wholesaler of the scaffold. Moreover, it is undisputed that R & R was an ultimate consumer of the scaffold since it actively used the scaffold in its plastering business. But was R & R the first ultimate consumer? This question is complicated by the fact that SESCO at times sold scaffold and at other times leased scaffolds as a part of its business.

To determine whether SESCO was an ultimate consumer, I apply the third *Witherspoon* principle; that is, I must determine whether SESCO " 'us[ed] [the scaffold] as a part of [its] own operation, not as a wholesaler, or not as a retailer.' " *Witherspoon*, 219 Neb. at 121, 362 N.W.2d at 40 (quoting *Floor Debate on L.B. 665*, Neb. Unicameral 85th Leg., 2d Sess. 6861 (Feb. 27, 1978) (statement of Sen. Bereuter)).

As indicated in part I of this opinion, I am convinced as a matter of fact that SESCO used the scaffold as a part of its own business and not as a wholesaler or retailer. I am so persuaded because SESCO was in the business of leasing scaffolds to contractors, and it is substantially more probable than not that SESCO leased the scaffold to contractors no later than January 1, 1978. (Pt I, ¶¶ 30–34).

Having determined that both SESCO and R & R were ultimate consumers, I apply the fourth *Witherspoon* principle—that the first sale to an ultimate consumer triggers the statute—to determine which of the two sales—the sale to SESCO or the sale to R & R—is the critical date. Since it is clear that SESCO was first to purchase the scaffold, normally the sales date to SESCO would trigger the statute.

I do not believe, however, that the date of sale to SESCO should be used in this case.

Since the scaffold may have been briefly available for sale as a new scaffold, rather than immediately put to rental use by SESCO, I believe the appropriate date for triggering the statute is January 1, 1978. The January 1, 1978 date is derived from the fact that I previously found the scaffold was placed into "use" by SESCO, through leasing to third-parties, no later than January 1, 1978 (six months after SESCO received the scaffold).

**3.**

In order to defeat the finding and conclusion that January 1, 1978 is the date the product was "first sold for use" Plaintiffs raise a number of arguments. I am not persuaded by any of the arguments, and respond, albeit briefly, to only those arguments which in my opinion merit a response.

**a.**

Plaintiffs suggest that SESCO's leasing of the property does not amount to the "use" contemplated by the statute. I am not persuaded by this argument.

Initially, the statute specifically contemplates that "use" may take place as the result of a sale or a lease for use; that is, the statute uses the words "first sold or *leased* for use." Neb.Rev.Stat. § 25–224(2) (emphasis added). Moreover, the Nebraska Supreme Court quoted with approval the definition of "use" meaning " 'to convert to one's service.' " *Witherspoon*, 219 Neb. at 121, 362 N.W.2d at 40 (quoting *Black's Law Dictionary* 1381 (5th ed. 1979)). Still further, the Nebraska Supreme Court was impressed with the fact that Nebraska legislators understood "use" in the sense of " 'using [the product] as a part of their own operation, not as a wholesaler, or not as a retailer.' "

When a leasing company like SESCO leases a scaffold to contractors the scaffold is "leased for use" as contemplated by the plain words of the statute. When a leasing company like SESCO leases a scaffold the product is "converted to [SESCO's] service" as contemplated by a common dictionary definition of the word "use." And, when a leasing company like SESCO leases a scaffold the product is "us[ed] as a part of [SESCO's] own operation, not as a wholesaler, or not as

a retailer" as contemplated by the Nebraska legislature. Accordingly, the sale of the scaffold to SESCO and SESCO's lease of the scaffold for use by contractors is the type of "use" described by the statute of limitations at issue in this case.

Any other interpretation of the statute would create truly unpredictable and unfair results for manufacturers and consumers alike. An example will illustrate the point.

Assume that Alumax manufactured two scaffolds just like the one at issue. Assume further that Alumax sold the two scaffolds to Louisville Ladder which in turn sold one scaffold to SESCO and one scaffold to R & R on January 1, 1986. Assume further that on January 1, 1997 R & R leased the scaffold purchased by SESCO and used the leased scaffold along side the one that R & R had earlier purchased. Assume further that on January 2, 1997 both scaffolds failed in precisely the same manner and for precisely the same reasons and two R & R employees, one standing on the R & R scaffold and one standing on the SESCO scaffold, were injured in precisely the same manner.

In this example, if Plaintiffs' interpretation of the statute is accepted, the R & R employee who stood on the scaffold purchased by R & R is barred from recovery since more than 10 years have passed since the date of the first sale for use. However, as to the second R & R employee his or her action would not be barred since SESCO's "use" of the scaffold for leasing purposes would never start the statute of limitations.

This is an absurd result from the viewpoint of the manufacturer and from the viewpoint of the consumer. The Nebraska legislature could not have intended such a result, and I refuse to impute such an intention to that body when an otherwise reasonable interpretation of the statute exists.

**b.**

Plaintiffs also argue that the evidence is simply too speculative to allow one to determine the date of manufacture of the scaffold by Alumax, the date of purchase by Louisville Ladder, the date of sale by Louisville Ladder, and the date or fact of first use by SESCO. Essentially, Plaintiffs argue that

there is no "hard" evidence of any of these dates or uses. I am not persuaded by this argument.

First, all of the witnesses upon whom I have relied to come to the findings and conclusions challenged by the plaintiffs were very credible. Indeed, with the exception of Mr. Davis from Alumax, the witnesses who testified regarding manufacturing, sales, purchase and leasing information were not parties or employees of parties.

Second, it is true that some of the testimony given in this case about dates and uses was predicated upon common business practices as opposed to such things as invoices or the like. However, Plaintiffs' argument in this regard is nothing more than a disagreement with Federal Rule of Evidence 406. That Rule permits courts to accept into evidence information about routine business practices "whether corroborated or not" for the purpose of proving that the conduct of an "organization on a particular occasion was in conformity with the habit or routine practice."

As Judge Weinstein and Professor Berger have observed, "Courts are inclined to leniency" when it comes evidence of routine business practice. 2 Jack Weinstein & Margaret Berger, *Weinstein's Evidence* ¶ 406[03] at 406–17 (1992). This is because routine business practices are often relied upon by other businesses and because routine business practices are derived from concerted planning activities driven by economic concerns about efficiency which are of necessity more regimented than individual conduct. *Id.*

In this vein I observe that all of the witnesses who testified about routine business practices were witnesses with substantial knowledge about their own organizations. For example, John M. Monohan, former vice-president of administration and engineering at Louisville Ladder, testified about the routine business practice of the company for which he worked. Jimmie G. Davis, general manager of Alumax's plant, testified about the routine practice of Alumax's plant. SESCO's president, Forest W. Schoeneman, Jr., testified about the routine practices of his

company. As a result, I am not concerned by the fact that much of the evidence relied upon by Alumax is predicated upon the routine practices of various businesses.

Third, many critical dates are beyond dispute. For example, the starting date—the date of manufacture—has been established not only by common business practice, but by reference either to the physical attributes of the particular scaffold at issue (the label residue and stencil) or by a comparison of the subject scaffold itself to well-documented and dated design changes. Moreover, the fact of sale to Louisville Ladder and the fact of sale to SESCO is firmly documented or undisputed. Still further, the date of sale to R & R is well documented. Hence it is inaccurate to suggest that Alumax's date evidence is founded upon one unsupported inference after another. On the contrary, the evidence leaves no room whatever for doubt as to many important dates.

Fourth, all of the dates suggested by Alumax make sense whereas Plaintiffs' counter arguments frequently do not. For example, Plaintiffs suggest that when SESCO bought the scaffold it did not use the scaffold for over 11 years until the scaffold was sold to R & R. Kindly put, this makes no sense.

In summary, Alumax's evidence regarding the various dates and uses critical to an analysis of the statute of limitations question was not speculative.

### c.

Plaintiffs additionally argue that Alumax failed to prove when the new hook assembly was sold. Essentially, Plaintiffs argue that because the plate was reversed I should conclude that a new hook assembly was substituted, and if I so conclude the defendant has failed to prove when the new hook assembly was first sold. Therefore, so the argument goes, I must find in favor of Plaintiffs because there is no measuring date from which to apply the statute of limitations. There are four responses to Plaintiffs' argument.

First, reversal of the plate does not establish that a new assembly was added. As Mr. Davis said, the "hook could have been replaced, or it could have been simply removed and put back." (Vol. II, Tr. 203:25–204:1.)

As is obvious, the plate could have been removed, reversed and reinstalled for any number of reasons without adding a new hook assembly. The only thing that is known is that the washer plate was reversed. The fact of reversal suggests nothing about whether the hook assembly was the original or a replacement.

Plaintiffs point to such things as the appearance of the hook to indicate that the hook assembly looks "newer" than the other hook assemblies on the scaffold. From these suggestions Plaintiffs assert that the hook assembly was in fact a replacement part.

But these subjective interpretations of the evidence amount to nothing more than speculation. For example, I have examined the hook assembly at issue and I cannot say with any assurance that the hook assembly looks materially different than any other hook assembly. There is certainly no scientific evidence in the record that would allow me to find that the hook assembly was a replacement. In sum, there is no competent evidence to suggest that the original hook assembly was later substituted with a replacement hook assembly.

Second, even if a new hook assembly was added the addition of a "new" hook assembly in lieu of the "old" hook assembly is meaningless because the hook assembly did not in any sense serve as a proximate cause of the injury. As noted earlier, the "product" which caused the injury was the scaffold *as a unit* and not the hook assembly. Indeed, the product had to function as a unit before it could cause the injury which occurred in this case; that is, the hook, by virtue of the plate, nuts, and bolts, imparted stress to the sidewall causing the wall to bend back and forth which in turn caused a fatigue fracture in the sidewall which over time caused the sidewall adjacent to the plate to tear away from the remainder of the sidewall.

Thus, the relevant date is not when a replacement was sold for use. Rather the critical date, according to the terms of the statute, is when the "product" which caused the injury—in this case the scaffold as unit—was sold for use.

It is important to remember that substitution of one hook assembly for another would make no difference in whether the scaffold failed. The result of substitution of one hook assembly for another "would be indistinguishable." (Vol. II, Tr. 152:13–153:15.) This is true because the design of the original hook assembly and the purported replacement was identical. (Vol. II, Tr. 118:17–20; 119:3–7; 141:13–18; 204:23–205:5; Vol. III, Tr. 300:16–301:7.) Therefore the injury would have occurred whether or not a replacement hook assembly was added.

In this regard both the original hook assembly and any replacement permitted reversal of the plate. Thus the comment by Plaintiffs' expert that the "time to fracture" might have been increased due to reversal of the plate makes no difference *insofar as replacement of parts* is concerned because both the original hook assembly and any replacement would be capable of the same reversal.

Put another way, even if reversal of the plate accelerated the time to fracture it would make no factual or legal difference whatever whether the plate was reversed on the original hook assembly or on a replacement hook assembly since the ability to reverse the plate existed in all hook assemblies and the same injury would have occurred regardless of which hook assembly was being used or which plate was reversed.

As Judge Posner has recognized in a case where a component was added more than ten years after the original product was manufactured and sold: *"Unless the component* is defective and *caused the injury,* the suit is barred *because then the defect must have been in the original product ...."* *Richardson v. Gallo Equipment Co.,* 990 F.2d at 332 (Indiana law) (emphasis added).[12] *See also Black v. Henry Pratt Co.,* 778 F.2d 1278, 1282–84 (7th Cir.1985) (sale of replacement parts, consisting of bearings, seats, packing, and glue, for original valve assembly, which was made up of various components, did not extend or toll statute of limitations where

valve assembly failed because of defect in components consisting of chain and chain mechanism) (Indiana law).

■ Third, even if I ignore the lack of replacement part causation, "merely adding a component, without extending the life of the original product ..., does not affect the statute of repose." *Richardson,* 990 F.2d at 332. "Reconstruction or reconditioning" will cause a statute of limitations to start anew, but "mere repair" will not. *Id.* at 331.

The pertinent question under such circumstances is whether the addition of the component "has the effect of lengthening the useful life of a product *beyond what was contemplated when the product was first sold ...."* *Id.; see also Hayes v. Otis Elevator Co,* 946 F.2d 1272, 1277 (7th Cir.1991) (repair of elevator under a maintenance contract did not toll the statute of limitations) (Illinois law).

In this case the manufacture of replacement hook assemblies by Alumax did not have "the effect of lengthening the useful life" of the scaffold "beyond what was contemplated when the product was first sold." *Richardson,* 990 F.2d at 331. Alumax's plant manager agreed *in answer to a question phrased by Plaintiffs' counsel* that use of replacement hooks amounted to *"repairing a part."* (Vol. II, Tr. 206:17–18.) Mr. Davis further specified that Alumax designed the scaffold to accommodate replacement hook assemblies in the same way a car is designed to accommodate a new tire when another goes flat. (Vol. II, Tr. 213:12–21.) In this regard it is undisputed that hooks can and do break soon after a scaffold is purchased without damage to the other parts of the scaffold. (Vol. II, Tr. 212:18–213:8.)

It is economically inefficient to require a consumer (and the economy as a whole) to discard a perfectly good product (like a scaffold) soon after it is purchased simply because a component (like a hook) is broken, when the component could easily be replaced for much less than the cost of the product as a unit. This is why cases like *Richardson*

---

12. Judge Posner also observed that it is frequently necessary to examine issues of causation when applying a product liability statute of limitations which involve components even though such an

analysis looks like a merits determination because "in the case of a component the two issues are intertwined." *Richardson,* 990 F.2d at 332.

distinguish between "repair" and "reconstruction or reconditioning." [13]

Essentially, Plaintiffs argue that sale and use of a repair part to fix a product, which is made of components, starts the statute of limitations anew even though the repair part does not extend the life of the product beyond that contemplated at the time the product was first sold. Plaintiffs' argument, if accepted, would promote the manufacture of non-repairable products and provide a disincentive to manufacture repair parts. Thus, Plaintiffs' argument promotes economic inefficiency. I do not believe the Nebraska legislature had such an intent when it passed Neb.Rev.Stat. § 25–224(2). Consequently, I reject Plaintiffs' construction of the statute.

Fourth, even if I assume that: (1) a replacement hook assembly was added at some point; (2) the replacement hook assembly played some part in causing the injury because the plate was reversed on the replacement hook assembly thus accelerating the time to failure; (3) reversal of the plate would not have occurred (and did not occur) on the original hook assembly; and (4) manufacture of the replacement hook assembly had the effect of lengthening the useful life of the scaffold beyond what was contemplated when the product was first sold, there is still no reason to believe that the replacement hook assembly (and plate reversal) was "a but for cause."

"A proximate cause" need not be the sole cause of injury under Nebraska law. *NJI2d* 3.41 at cmt. 3.41–4. Nonetheless, "a proximate cause" must be a "but for cause." *Merrick v. Thomas*, 246 Neb. 658, 663, 522 N.W.2d 402, 407 (1994); *NJI2d* 3.41 cmt. at 3.41–4 to –5 (collecting cases). In other words, it must be a cause "without which the result would not have occurred." *NJI2d* 3.41.

Plaintiffs' expert admitted that "the fracture would have occurred whether or not the washer plate had been inverted" (Vol. III, Tr. 302:8–12) adding, almost as an oversight, that inversion of the plate from the normal position would accelerate the time to failure by a "ballpark estimate" of 20 percent. (Vol. III, Tr. 303:3–23.)

The expert's comment regarding acceleration of the time to failure provides no basis for concluding that replacement of the hook assembly followed by reversal of the plate was a "but for" part of the causation chain. The expert made no scientific attempt to quantify his "ballpark estimate" of "20 percent" faster "time to failure" and then apply that concept to the injury at issue.[14]

For example, I do not know how much longer the plaintiffs would have had to stand on the scaffold before it failed if the hook assembly had not been replaced and the plate inverted. Was time accelerated in parts of a second? I do not know. What I do know is that Plaintiffs' expert agreed that the "fracture would have occurred whether or not the washer plate had been inverted."

In sum, there is simply no reason to believe that replacement of the hook assembly and inversion of the plate (if that occurred) played a "but for" part in the causation chain. If the replacement part did not produce a "but for cause" then the sale of the part for use is irrelevant under Neb.Rev. Stat. § 25–224 because the part was not the "product" which "caused" the injury.

### E. Ultimate finding and conclusion

The "product" was first sold for use on January 1, 1978. This product liability action was not filed until January 6, 1994.[15] Therefore under Neb.Rev.Stat. § 25–224(2) Plaintiffs' suit against Alumax is barred because more than 10 years have elapsed between the time the product was first sold for use and the time suit was commenced.

Accordingly,

IT IS ORDERED that by separate document judgment shall be entered for Alumax

---

**13.** There is no evidence that Alumax made replacement hook assemblies "to reconstruct or recondition [the scaffold] ... in order to reduce expected liability costs" which would otherwise flow from the sale of new scaffolds. *Richardson,* 990 F.2d at 331.

**14.** Metal fatigue occurs at different rates with different loads. (Vol. III, Tr. 303:16–23.)

**15.** I assume without deciding that the filing of the amended complaint against Alumax related back to original filing date against Louisville Ladder.

and against the Plaintiffs providing that Plaintiffs shall take nothing because their suit is barred by Neb.Rev.Stat. § 25–224(2) (Reissue 1995) and Plaintiffs' complaints are dismissed with prejudice.

682

CUSTOMER PART NO. 082-02-02699

EXHIBIT
Part of
141

684

EXHIBIT

CUSTOMER PART NO

DWG NO  F-2637-C  REV

REVISION
| DATE | BY | REV | PART NAME |
| --- | --- | --- | --- |
| 10-23-73 | | A | 345 dia .313 Rev. s'd |
| 10-27-73 | | A | Rev. Spds |
| 1-31-75 | | B | |
| 2-7-75 | | C | Coil S-up Run |

.345
1.374    2.062
A
.345
.406dia
.406
1.125

HOWMET CORPORATION
SOUTHERN EXTRUSIONS DIVISION · Magnolia, Arkansas

CUSTOMER  S.E. SCAFFOLD
CITY  MAGNOLIA    STATE  ARK
PART NAME  WASHER PLATE    EST NO
CUSTOMER PART NO    DIE NO  SE-60490
FAB. DWG. NO  F-2637

DRN. BY    CHK. BY    SCALE    DATE  10-18-73
FINISH

SETUP & RUN  1-0" .53x1

RT FOR OPER
TOOLING
TYPE OF PACKAGING  PCS/PKG
EQUIPMENT USED  Bliss Press

PCS/MH  SET UP/OPER

Figure A
Right side up

Figure B
Upside down

Figure C
Illustrating
Exposed Burnish Mark

EXHIBIT
144 A